**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF DELAWARE**

_____

|  |  |  |
|---|---|---|
| **GEORGE L. MILLER, AS** | : | |
| **CHAPTER 7 TRUSTEE FOR** | : | |
| **AMERICAN BUSINESS FINANCIAL** | : | |
| **SERVICES, INC.,** | : | **CIVIL ACTION NO. 05-921** |
| | : | |
| **Plaintiff** | : | |
| | : | **AMENDED COMPLAINT** |
| **v.** | : | |
| | : | **JURY TRIAL DEMANDED** |
| **BOSTON PARTNERS MANAGEMENT,** | : | |
| **L.P., BOSTON PARTNERS ASSET** | : | |
| **MANAGEMENT, L.L.C., DEPOSITORY** | : | |
| **TRUST COMPANY AND JANE** | : | |
| **AND JOHN AND JANE DOES 1-50,** | : | |
| | : | |
| **Defendants.** | : | |

_____ :

## <u>AMENDED COMPLAINT</u>

George L. Miller, Trustee of American Business Financial Services, Inc. ("ABFI" or "Plaintiff"), through undersigned counsel, brings this Complaint containing the following nine counts:  Conspiracy to Restrain Trade in Violation of the Sherman Act, 15 U.S.C. § 1 (Count I); Violations of Regulation SHO, 17 CFR § 242.203 (Count II); Unjust Enrichment (Count III); Conversion (Count IV); Tortious Interference with Business and Contractual Relationships and Prospective Business and Contractual Relationships (Count V); Deceptive Trade Practices (Count VI); Civil Conspiracy (Count VII); Negligence (Count VIII); and Turnover (Count IX).  Miller alleges the following in support of his Complaint:

## JURISDICTION

1.      This action arises under 15 U.S.C. § 1. *et seq.*, 15 U.S.C. § 78(j) and 17 C.F.R. § 242.203 as hereinafter more fully appears.  This Court has pendent/supplemental jurisdiction over the claims that are based on state law.  This Court also has jurisdiction pursuant to 12 U.S.C. § 632.

2.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1334 as this case is related to a bankruptcy case instituted by ABFI which is pending in this District.

3.      This District is the proper venue for this action pursuant to 28 U.S.C. § 1409 as this matter is related to a bankruptcy case pending in this District.

## PARTIES

4.      George L. Miller is Trustee for ABFI under Chapter 7 of the United States Bankruptcy Code.  ABFI is corporation organized and existing under the laws of the State of Delaware formerly with a principal place of business in Philadelphia, Pennsylvania.  ABFI was a diversified financial services organization operating predominately in the eastern and central United States and its stock was publicly traded on the NASDAQ.  Through its subsidiaries, ABFI originated, serviced and sold first and second lien residential home equity loans and business purpose loans.  ABFI also processed and purchased home equity loans through its Bank Alliance Services program.

5.      Defendant Boston Partners Asset Management, L.P. is a limited partnership organized and existing under the laws of the state of Delaware ("Boston Partners, L.P.") and maintains its principal place of business in Boston, Massachusetts.

6.    Defendant Boston Partners Asset Management, L.L.C. ("Boston Partners, L.L.C.") is a limited liability company organized and existing under the laws of the State of Delaware and maintains its principal place of business in Boston, Massachusetts.[1]

7.    Boston Partners is an investment management firm that provides investment services to its clients and also trades securities on its own behalf. Boston Partners is a registered Investment Advisor with the United States Securities and Exchange Commission ("SEC") and in September, 2002 a subsidiary, Robeco USA, Inc., of one of Europe's largest mutual fund and financial services companies, Robeco Groep NV, purchased 60% of Boston Partners. Upon information and belief, Boston Partners controls hedge funds for the purpose of engaging in the "short selling" of securities. Boston Partners knowingly and willingly engaged in the unlawful conduct described in this Complaint below. Boston Partners regularly conduct and solicit business in Delaware and with Delaware residents and has tortiously injured Delaware resident ABFI through Boston Partner's conduct.

8.    Defendant Depository Trust Company ("DTC") is a limited-purpose trust company under the state of New York's banking laws, a member of the U.S. Federal Reserve System and a clearing agency registered with the SEC. DTC is what is known as a "clearinghouse" for stock trades agreed to by stock trading organizations and does the behind the scenes clerical work necessary to "settle" or "close" those trades. It is DTC's duty and obligation to make sure that a stock has been borrowed or can in fact be borrowed before executing any "short sell trades" (short selling is described below) requested by stock traders such as the other Defendants in this case. DTC regularly

---

[1]   Throughout this Complaint, all references to "Boston Partners" include both the L.P. and L.L.C. identified in paragraphs 2 and 3, above, unless a specific business association is identified (i.e., Boston Partners, L.P.).

conducts and solicits business in Delaware and with Delaware residents and has tortiously injured Delaware resident ABFI through DTC's conduct.

9. The Doe Defendants are individuals and organizations, presently unknown to ABFI, in the business of buying and selling stocks, that knowingly and willingly participated and conspired with Defendants Boston Partners in some or all of the unlawful conduct described herein. ABFI believes that broker/dealers that are registered with the SEC to buy and sell publicly traded stocks are among the Doe Defendants. At all relevant times, the Doe Defendants either held short positions in ABFI stock, and/or engaged in the wrongful and unlawful conduct described in this Complaint in order to profit. Upon information and belief, the Doe Defendants regularly conduct and solicit business in Delaware and with Delaware residents and have tortiously injured Delaware resident ABFI through their conduct.

**FACTS RELEVANT TO ALL COUNTS**

10. Defendants' actionable conduct can be broken down into three categories: (1) illegal "Naked Short Selling" of ABFI's stock; (2) "Spoofing"; and (3) a vicious pattern of conduct including sending anonymous letters to potential business partners of ABFI and internet postings designed solely to damage and in fact destroy Plaintiff ABFI's business, which is now in bankruptcy. The sheer volume of short selling that began in late 1999 also shows that there was an illegal scheme to drive down the price of ABFI's stock. (Discussed at ¶ 52 after the above three categories of conduct).

**(1)     The Illegal Practice of Naked Short Selling**

11. To understand *Naked* Short Selling, it is first necessary to understand the trading strategy referred to as "short selling." Short selling is a stock trading strategy

used by individuals and organizations in the financial services industry such as Defendants and is carried out by borrowing a stock from someone (usually a large financial institution that may own many shares of the stock) and then selling the borrowed stock to someone else.  The "short seller" is the entity that borrowed the stock and then sold it.  The short seller then hopes that the price of the stock declines so that when it is time for the short seller to return the stock that was borrowed to the entity that lent it, the short seller is able to purchase the same stock at a lower price than what the short seller received when the short seller sold the borrowed stock.  Assuming that the price of the stock did in fact decline, then the short seller keeps as a profit the difference between the higher price that the short seller received when it sold the borrowed stock and the lower price at which the short seller purchased the stock when it was time for the short seller to return the borrowed stock to the lender.  In sum, short selling is a bet that the price of a stock will go down, since if the price of the borrowed stock goes up after the borrowed stock was sold by the short seller, then the short seller will lose money because it will have to buy the stock at the higher price in order to return the stock to the lender when that time comes under the borrowing agreement with the lender.

12.     *Naked* Short Selling is entirely illegal and occurs when the short seller (i.e., Defendants) sells a stock (such as Plaintiff ABFI's stock) ***even though the short seller has not borrowed the stock and therefore does not possess the stock it is selling***. A naked short seller creates "imaginary shares" of a stock and sells those imaginary shares.  Naked short selling has also been described as "counterfeiting" shares of a stock. A naked short seller is effectively "issuing" shares of a company's stock which is something only the company has the right to do when it wants to raise money through

investors.  The dishonest and illegal practice of Naked Short Selling has also recently been referred to as "stockgate".

13.    Defendants Boston Partners and the Doe Defendants engaged in Naked Short Selling of ABFI's stock and made millions of dollars by effectively "issuing" ABFI's stock.  Only a company may issue its own stock to raise money and the money that these Defendants made in this manner should be property of the estate of the now bankrupt ABFI.

14.    Upon information and belief, Defendant DTC was the clearinghouse for the naked short selling of the other Defendants and allowed those Defendants to engage in naked short selling even though DTC was required to, but failed to, make sure that there was enough ABFI stock in its inventory available for the other Defendants to borrow (confirming that the shares of stock that your are short selling is called "covering" your short selling so that it is not illegal, "naked" short selling).  If DTC had done its job, rather than conspiring and cooperating with the other Defendants to carry out "naked short sells" then ABFI would not have suffered the harm that it suffered.

15.    In addition to unjustly enriching the Defendants by millions of dollars through their "issuing" counterfeit ABFI stock as described above, the illegal Naked Short Selling also intentionally caused at least two other major effects:  (a) it illegally restrained trade because other stock traders interested in buying or selling ABFI stock were precluded from executing such trades because shares of ABFI's stock were not available for delivery because the shares were being tied up in Defendants' short selling scheme; and (b) it drove the price of ABFI's stock down by diluting the market with

counterfeit and imaginary ABFI shares of stock that reduced the demand for legitimately issued shares of ABFI's stock and therefore artificially depressed the price of the stock.

**(2)    Spoofing**

16.    Upon information and belief, Defendants other than DTC also engaged in conduct known in the financial services industry as "spoofing".  Spoofing is designed to depress the value of a stock and therefore works hand in hand with "short selling" because short sellers, as described above, desire that a stock's price goes down so that they can make a profit.

17.    Spoofing is the practice of offering to buy or sell a large number of shares of a particular stock at a price that would discourage potential buyers or sellers of the stock from deciding to buy or sell.

18.    The spoofing buyer or seller, however, has no intention of actually buying or selling the large volume of shares offered and typically retracts the offer moments after it is made.

19.    During the material times relevant hereto, the practice of spoofing was repeated multiple times, thereby discouraging others from participating in the market for ABFI's stock.

20.    In sum, spoofing involves the making of fictitious offers to buy and sell a stock, the sole purpose of which is to manipulate the price of such a stock.

**(3)    Defendants' Vicious Pattern Of Conduct Including Sending Anonymous Letters To Potential Business Partners Of ABFI And Internet Postings Designed Solely To Damage And In Fact Destroy Plaintiff ABFI's Business, Which Is Now In Bankruptcy**

21.    In addition to the illegal short selling and spoofing designed to depress ABFI's stock price, Defendants other than DTC also engaged in a campaign of sending

anonymous letters and creating negative internet postings to lower the price of the stock. Because of the short positions held by Defendants they stood to profit significantly from a decline in ABFI's stock price. This conduct by Defendants violated applicable law, as more fully discussed below.

22.     Because ABFI's stock was what is known as a "thinly" traded stock, meaning that the volume of shares traded on any given day on the NASDAQ National Market was very low (only .48%/day of the total outstanding shares), and because there were a relatively small number of outstanding shares that were held publicly, ABFI's stock was very vulnerable to price volatility when blocks of shares were traded.

23.     Thus, to force down the prices of a stock like ABFI, manipulative short sellers like Defendants will distribute information, regardless of its accuracy, about such a company suggesting that it is in a financial or legal crises and that the crises is imminent. Through such conduct, the short seller attempts to manipulate the market into selling the stock thereby driving the price of the stock down and allowing short sellers like Defendants to reap large profits from their short positions. This practice is known as "short and distort".

24.     Upon information and belief, beginning in or about 2000, Boston Partners, through one of its partners, Eric Connerly, and with the help of co-conspirators, began posting negative information about ABFI on internet bulletin boards such as Yahoo! Finance. These postings were designed to leave the reader with the impression that they were authored by an "insider" with negative information about ABFI.

25.     Upon information and belief, these postings were made by Defendants and/or their co-conspirators as part of a "short and distort" conspiracy to drive down the price of ABFI's stock so that short sellers, such as Defendants, could profit.

26.     Defendant Boston Partners' Eric Connerly began posting negative comments about ABFI on the Yahoo! Finance message board in approximately January 2000.  Connerly used the screen names Phil_Fisher, El_Pescador_1 and LePoissonier. Connerly used these screen names to hide his true identity and affiliation.

27.     On March 23, 2000, a Phil_Fisher posting by Connerly intimated that ABFI was engaged in predatory lending and characterized ABFI as a "loan shark".

28.     On May 9, 2000, Connerly criticized ABFI's independent accountant, BDO Seidman LLP, and its ability to accurately audit ABFI's accounts and make the necessary judgments, stating that BDO Seidman did not have "enough experience to make those judgments".  There was no factual basis for these assertions.  Connerly also sarcastically and in a negative way referred to BDO Seidman as a "pillar of rectitude", intending to impugn the credibility of BDO Seidman and ABFI.

29.     On May 30, 2000, Connerly posted a message that compared ABFI with two other lenders that were experiencing difficulty.  Connerly stated "why should ABFI be untouched by what's going on to business at similar competitors?  Might their assumptions be either [sic] a little aggressive?  It doesn't mean that they're bad guys or they're even fraudulent, just that profits and book value might be less than the accounting might show".

30.     On May 31, 2000, Connerly posted the following on the ABFI Yahoo! Finance message board:

(1) I would invest in ABFI assets only if I could get them at a significant discount. Their IO's, for example, I might buy at $.30 on the dollar. Their equity, certainly not.

(2) I am currently short ABFI, mainly because I believe they will go out of business within the next two years.

(3) I think rationale people should also be short ABFI as long as they can stomach the occasional short squeeze.

31.    On June 1, 2000, Connerly posted a message with the title "Fundamentals and Fraud." The use of the word "fraud" in the message line was intended to "spook" the market and drive down the price of ABFI's stock.

32.    Because ABFI is such a thinly traded stock, such postings had the negative effect of driving down the price of its stock.

33.    On March 22, 2000, the day before one of the first negative onslaughts by Defendants (*see* Paragraph 24, above), ABFI's stock price closed at $15.05 and by August 15, 2000 the stock price had declined to $8.87, as adjusted for stock dividends and stock splits. By December 29, 2000, ABFI's stock had sunk to $4.48.

34.    Each time ABFI's stock recovered, the short sellers such as Defendants would engage in illegal conduct such as spoofing, patterns of negative postings similar to those detailed above and anonymous letter writing of the sort described below. The purpose of this conduct was to drive the price down, thus creating an artificial cycle that generated profits from short sales.

35.    Beginning in January 2001, individuals whose identities are not yet known, in furtherance of the conspiracy to depress ABFI's stock, created or caused to be

created several anonymous letters, which were sent to ABFI's independent accountant, state and local regulators and, in at least one case, an underwriter, which eventually refused to enter into a transaction with ABFI because of the false allegations made in the letter.  (Discussed below at ¶ 40).  Based upon information learned to date, ABFI believes that Boston Partners and Connerly were aware of and/or participated in some or all of the activity more fully described below.

36.    On or about January 26, 2001, BDO Seidman received an anonymous letter that was also purportedly sent to the SEC, NASD, the plaintiffs' securities class action law firm, Milberg Weiss, and the 60 Minutes television show.  This anonymous letter criticized ABFI's business model and management and accused ABFI of deceiving investors and of "running a sophisticated pyramid scheme".

37.    On or about May 25, 2001, Ernst & Young, ABFI's auditor at that time, received a second anonymous letter that was addressed to the Pennsylvania Attorney General, Michael Fisher.  The letter also showed that it was sent to the SEC, the CEO of Ernst & Young, Milberg Weis, the Associated Press and the Florida Attorney General, Robert A. Butterworth, as well as the Deputy Attorney General of Pennsylvania, Gerald J. Pappert.  This anonymous letter again accused ABFI of conducting a "pyramid scheme" and further stated that ABFI was "fleecing" investors.

38.    On or about August 24, 2001, a third anonymous letter was received by BDO Seidman.  This anonymous letter was addressed to the SEC and indicated that copies were sent to Milberg Weiss, "State of Penn. Attorney General" and the NASD. This letter accused ABFI of defrauding investors, criticized ABFI's auditors and claimed that ABFI is running a "pyramid scheme" to defraud "widows and orphans".

39.    ABFI received a fourth anonymous letter dated May 15, 2003, which also was sent to BDO Seidman, and was purportedly sent to state and federal regulators.  The intent was to interfere with ABFI's business and harm its stock price.

40.    The May 15, 2003 letter also made the outrageous claims that ABFI is engaged in criminal activity, has "mafia connections" and makes "fictitious loans".

41.    The May 15, 2003 anonymous letter is written as though it was authored by an ABFI insider and alleges that ABFI is engaged in a "pyramid scheme" involving illegal accounting manipulations, illegal conduct and other improper activities.

42.    Upon information and belief, the anonymous letters were prepared and sent as part of a continuing conspiracy to damage ABFI's business for the benefit of the short sellers, such as Defendants.

43.    The May 15, 2003 letter was also sent to Credit Suisse First Boston ("CSFB"), which, at the time, was in the process of preparing to underwrite ABFI's securitization of its loans for the second quarter of 2003.  ABFI would have recorded a gain in its second quarter of 2003 on the sale from this securitization of over $63 million.

44.    The securitization transaction between ABFI and CSFB was scheduled to close on June 30, 2003, however when the Chairman of CSFB received the May 15, 2003 anonymous letter, CSFB declined to underwrite the securitization.  Other investment banks likewise declined to underwrite the securitization because of the May 15, 2003 anonymous letter.

45.    As a result, the securitization was aborted and ABFI was forced to engage in a sale of its loans to investors on a whole loan basis at an amount significantly less than ABFI would have received through the securitization.

46.     The above described unlawful conduct by Defendants was part of a pattern of conduct and a continuing conspiracy designed to drive the price of ABFI's stock down and ultimately destroy ABFI so that Defendants would profit in their short selling market manipulation scheme.

47.     ABFS also lost significant revenue that it would have received by servicing the loans.

48.     Moreover, Defendants' illegal acts negatively affected ABFI's ability to borrow funds or to raise capital through debt or equity offerings.

49.     ABFI was monetarily damaged by Defendants' illegal scheme.   The artificially depressed stock resulted in lost equity to ABFI through the employee stock option program, because the employee stock options were either not exercised, or new options were granted at artificially depressed prices.  In addition, at certain times options were not awarded due to the artificially depressed price of the stock.

50.     On December 22, 2003, Connerly was deposed in another lawsuit pending in Philadelphia, Pennsylvania and testified "I can't – no, I don't" when asked whether he could categorically deny having any involvement in the preparation of the May 15, 2003 anonymous letter.

51.     After his deposition, Connerly submitted an errata sheet changing his deposition testimony.

52.     Also during his Philadelphia deposition, Connerly testified "I believe some of the elements of ABFI's financing are similar to a pyramid scheme."

53.    Upon information and belief, the internet postings and anonymous letters described above were timed to depress the value of ABFI's stock to benefit the short sellers such as Defendants.

54.    Because of these allegations of ABFI's purported wrongful and illegal conduct, the value of ABFI as a company declined significantly.  ABFI is now bankrupt.

**4.    Raw Numbers Evidencing Defendants' Illegal Stock Manipulation Scheme**

55.    The obscene increase in short sales beginning at the end of 1999 also evidences Defendants' effort to illegally drive down the price of ABFI's stock through illegal "naked short selling", spoofing and making the above described campaign of internet posting and anonymous letters so that they would profit from their short positions.

56.    The term "Public Float" refers to the number of shares of a stock that are freely traded in the hands of the public and is calculated by taking the total shares outstanding and subtracting any shares owned by officers, directors and beneficial owners of 10% or more of the stock.  The "Short Percentage" measures how much short selling is occurring with respect to a specific stock and is calculated by taking the outstanding number shares that were sold short on any given day and dividing that number by the Public Float and then multiplying the resulting decimal by 100.

57.    Beginning at the end of 1999, at about the same time Defendants, together and in concert with others, commenced their illegal smear campaign as described above, the volume of ABFI stock sold short increased dramatically.   In fact, the "Short Percentage" of ABFI's stock ranged from approximately a mere 2.44% to *51.46%* as adjusted for stock dividends and stock splits.

58.    From January 2001 to December 2001, the Short Percentage of ABFI stock averaged 51.46% of the public float as adjusted for stock dividends and stock splits.

59.    From January 2002 to December 2002, the Short Percentage of ABFI stock averaged 44.20% of the public float as adjusted for stock dividends and stock splits.

60.    From January 2003 to December 2003, the Short Percentage of ABFI stock averaged 34.56% of the public float.

61.    As of January 2004, the Short Percentage of ABFI stock was 34.56% of the public float.

62.    The amount of shares being sold short in January 2001 was 610,272 adjusted for stock dividends and stock splits.  Just one year before, in January 1999, only 6,444 shares of ABFI were being sold short.

63.    Upon information and belief, it was impossible for such a short interest to exist without the existence of a conspiracy among short sellers, including Defendants, to engage in illegal, naked short sells, ***because there simply were not enough shares of ABFI's stock available to somebody short selling in the market in January 2001 to cover this volume of short sales***.  In other words, there was not enough ABFI stock available in the market to "borrow" in order for short sellers like Defendants to make good on their short sells.

64.    To this same end, from September 1999 through October 2000 alone, short selling entities and others working in concert with them were responsible for short selling approximately 771,495 shares of ABFI stock as adjusted for stock dividends and stock splits.

65.    As a result of the scheme described throughout this Complaint, the price of ABFI's stock was artificially depressed, and fluctuated between $3.26 to 20.07 per share, as adjusted for stock dividends and stock splits, for the period of time between December 1999 to December 2003.

66.    Upon information and belief, Defendants engaged in short selling during the relevant time period and in concert with other co-conspirators engaged in acts designed to manipulate the market for ABFI stock.

67.    Beginning in 2000, several entities amassed a tremendous aggregate short position in ABFI stock.

68.    The size, pattern and timing of these short sale transactions indicate that the short selling entities acted in concert and as part of a plan or scheme to manipulate the price of ABFI stock by shorting more ABFI stock than was available to the market for purchase or sale (i.e., illegal *naked* short selling through the creation of "imaginary" ABFI shares that were not actually available for borrowing as would be necessary to actually "close" or "settle" the trade agreements that Defendants were entering into with others).

69.    As explained above, Eric Connerly, a partner in Boston Partners, had engaged in the short sale of ABFI stock in September 2003.

70.    At that time (September 2003), ABFI stock was trading at an average price of $7.00 per share in September 2003 after averaging a price of $9.95 per share for the preceding nine months.

71.    In December 2003, ABFI learned that Boston Partners had executed a short sale through Goldman Sachs in 2003.

72.     Upon information and belief, Boston Partners was conducting illegal short sales through Goldman Sachs.

73.     In fact, Goldman Sachs had reported a short interest in ABFI's stock of 52,400 shares in February 2000 and by January 2001, Goldman Sachs' short interest in ABFI stock had skyrocketed to 318,932 shares as adjusted for stock dividends and stock splits, which amount represented approximately 30.26% of the entire public float of ABFI stock at that time and 52% of the 610,272 total short interest in ABFI stock at the time, as adjusted for dividends and stock splits.

74.     Because of this illegal market manipulation scheme and improper short selling, securing the delivery of ABFI stock bought and sold by others in legitimate transactions was rendered extremely difficult, and frequently impossible, resulting in attempted purchases and sales being aborted.

75.     In other words, as a consequence of the illegal short selling, others interested in buying or selling ABFI stock were precluded from executing such trades because shares of ABFI stock were not available for delivery.

76.     But for the illegal short sales of Defendants and others, there would have been timely delivery of the shares sold short to the purchasers thereof.   But for Defendants' unlawful actions including the illegal Naked Short Selling and violating SEC and NASD regulations, the price of the ABFI stock would not have been artificially depressed.

77.     Because of this unlawful conduct and the continual illegal short selling scheme, ABFI suffered irreparable harm.   ABFI is now bankrupt.   Because of its artificially depressed stock price, ABFI incurred an increase in both the cost of doing

business and a loss in confidence in ABFI by its lenders, insurers, investors and employees, which ultimately forced ABFI out of business.

## COUNT I

(Violations of the Sherman Act, 15 U.S.C. § 1 – Conspiracy to Restrain Trade)

(All Defendants)

78.    ABFI incorporates by reference herein Paragraphs 1 through 74 as if fully set forth at length.

79.    As described above, Defendants engaged in concerted action.

80.    The concerted action of Defendants produced anticompetitive effects with respect to the relevant product (ABFI's stock) and geographic markets (the nationwide NASDAQ stock exchange).

81.    The objectives of the conduct pursuant to the concerted action were illegal.

82.    ABFI was injured and suffered damages as a proximate result of the concerted action described above in this Complaint above.

WHEREFORE, George L. Miller, as Chapter 7 Trustee for American Business Financial Services, Inc. prays for relief as more fully set forth below.

## COUNT II

(Violation of 17 C.F.R. § 242.203 prohibiting Naked Short Selling)

(All Defendants except DTC)

83.    ABFI incorporates by reference herein Paragraphs 1 through 79 as if fully set forth at length.

84.    As described in the preceding paragraphs of this Complaint, Defendants engaged in the illegal practice of *naked* short selling by offering to sell counterfeited shares of ABFI stock that Defendants "imagined" and did not actually borrow or establish they could borrow.

85.    Defendants' violation was in connection with the sale of securities.

86.    The representations and omissions made by Defendants with respect to their inability to borrow shares of ABFI were material.

87.    Defendants conduct caused ABFI injury, including, among other things, a significantly depressed stock price.

88.    Defendants acted with scienter and their conduct was reckless and/or intentional.

89.    ABFI suffered damages as a result of the conduct of Defendants.

WHEREFORE, George L. Miller, as Chapter 7 Trustee for American Business Financial Services, Inc. prays for relief as more fully set forth below.

## COUNT III

(Unjust Enrichment)

(All Defendants)

90.    ABFI remedy at law. incorporates by reference herein Paragraphs 1 through 86 as if fully set forth at length.

91.    As described in the preceding paragraphs of this Complaint, Defendants were enriched by their practice of naked short selling ABFI's stock.

92.    As explained in Paragraphs 8 through 12 and 52 through 74 of this Complaint, the naked short selling performed by Defendant Boston Partners and others

amounted to a "public offering" of ABFI's stock and therefore the money "raised" (Boston Partner's profits from the illegal sale of ABFI stock that it "imagined" and pulled out of thin air) by Boston Partners constituted an unjust enrichment.

93.    ABFI suffered an impoverishment in the amount that Boston Partners profited from the imagined, counterfeited shares of ABFI stock that Boston Partners sold.

94.    Paragraphs 8 through 12, 52 through 74 and, directly above at 88 and 89 show that there was a relation between the enrichment and the impoverishment.

95.    There is an absence of any justification for Defendants' conduct.

96.    ABFI has no remedy at law.

WHEREFORE, George L. Miller, as Chapter 7 Trustee for American Business Financial Services, Inc. prays for relief as more fully set forth below.

## COUNT IV

(Conversion)

(All Defendants)

97.    ABFI incorporates by reference herein Paragraphs 1 through 93 as if fully set forth at length.

98.    ABFI had a property interest in its own stock and the right to issue such stock.

99.    ABFI had a right to possession of the shares of its own stock that Defendants illegally sold.

100.    ABFI sustained damages.

WHEREFORE, George L. Miller, as Chapter 7 Trustee for American Business Financial Services, Inc. prays for relief as more fully set forth below.

20

## COUNT V

(Tortious Interference with Business and Contractual Relationship and Prospective
Business and Contractual Relationships)

(All Defendants except DTC)

101.    ABFI incorporates by reference herein Paragraphs 1 through 97 as if fully
set forth at length.

102.    As described in the preceding paragraphs of this Complaint, ABFI had a
valid expectancy of contractual/business relationships with Credit Suisse Fist Boston and
other entities.

103.    Defendants knew of these relationships and expectancies.

104.    As described in detail in the preceding paragraphs of this Complaint,
Defendants intentionally interfered with ABFI's prospective business and contractual
relationships and induced or caused a termination of the expectant relationships that
damaged ABFI.

WHEREFORE, George L. Miller, as Chapter 7 Trustee for American Business
Financial Services, Inc. prays for relief as more fully set forth below.

## COUNT VI

(Deceptive Trade Practices)

(All Defendants except DTC)

105.    ABFI incorporates by reference herein Paragraphs 1 through 101 as if
fully set forth at length.

106.    As described in the preceding paragraphs of this Complaint, Defendants,
in the course of their business, vocation and/or occupation:

(a)    passed off ABFI's goods as their own;

(b)    caused a likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of the goods;

(c)    caused a likelihood of confusion or of misunderstanding as to filiation, connection, association with, or certification by ABFI;

(d)    used deceptive representations or designations of geographic origin in connection with goods;

(e)    represented that goods had the sponsorship and/or approval of ABFI, and that Defendants had quantities of ABFI's stock that Defendants did not have;

(f)    advertised goods with intent not to sell them as advertised;

(g)    advertised goods with intent not to supply reasonably expectable public demand; and

(h)    engaged in all of the conduct described in the preceding paragraphs of this Complaint which created a likelihood of confusion and/or misunderstanding.

107.    The Defendants willfully engaged in their conduct.

WHEREFORE, George L. Miller, as Chapter 7 Trustee for American Business Financial Services, Inc. prays for relief as more fully set forth below.

## COUNT VII

(Civil Conspiracy)

(All Defendants)

108.    ABFI incorporates by reference herein Paragraphs 1 through 104 as if fully set forth at length.

109.    A confederation or combination of two or more persons and or entities, including the Defendants identified in this Complaint and their co-conspirators, engaged in the unlawful acts described in the preceding paragraphs of this Complaint.

110.    The conduct referenced in Paragraph 106 of this Complaint was done in furtherance of a conspiracy to harm ABFI in the ways described in the preceding paragraphs of this Complaint, and with the goal of driving down ABFI's stock price so that the conspirators would profit through short selling.

111.    The conspirators engaged in the illegal practice of naked short selling, spoofing and a negative campaign of letters and internet postings in furtherance of their conspiracy.

112.    ABFI suffered actual damage as a result of the conspiracy.

WHEREFORE, George L. Miller, as Chapter 7 Trustee for American Business Financial Services, Inc. prays for relief as more fully set forth below.

## COUNT VIII

(Negligence)

(Defendant DTC only)

113.    ABFI incorporates by reference herein Paragraphs 1 through 109 as if fully set forth at length.

114.    As described in the preceding paragraphs of this Complaint, Defendant DTC is a clearinghouse for stock trades.

115.    DTC owed ABFI a duty not to allow illegal naked short selling of ABFI's stock.

116.    Defendant DTC breach its duty to ABFI.

117.    But for DTC's breach, ABFI would not have suffered the damages that it suffered.

118.    DTC's conduct was the cause of the damages suffered by ABFI.

119.    ABFI suffered damages.

WHEREFORE, George L. Miller, as Chapter 7 Trustee for American Business Financial Services, Inc. prays for relief as more fully set forth below.

## COUNT IX

(Turnover Under 11 U.S.C. § 542)

(All Defendants)

120.    ABFI incorporates by reference herein Paragraphs 1 through 116 as if fully set forth at length.

121.    Upon information and belief, Defendants conspired to issue imaginary stock on ABFI by which Defendant received proceeds.

122.    The proceeds of any equity issuance in the name of ABFI, whether real or imagined, is an asset/properly of the estate under 11 U.S.C. § 541 and subject to turnover under 11 U.S.C. § 542.

123.    Trustee demands turnover of all proceeds of all illegal short-selling under 11 U.S.C. § 542.

WHEREFORE, George L. Miller, as Chapter 7 Trustee for American Business Financial Services, Inc., demands judgment against Defendants as follows:

1.    Compensatory damages in an amount to be determined at trial;

2.    Double or treble damages due to the deliberate and willful conduct of the Defendants and as prescribed by statute;

3.      Punitive damages;

4.      Attorneys' fees, costs and interest;

5.      Imposition of joint and several liability against each of the Defendants;

6.      Injunctive relief ordering Defendants to turnover all proceeds, plus interest, from the sale of imaginary shares of ABFI as described in this Complaint; and

7.      Such other relief as this Court deems just and appropriate.


                                        CIARDI & CIARDI, P.C.


                          By: _____
                                        Rosalie L. Spelman, Esquire
                                        (Delaware Bar No. 4153)
                                        Albert A. Ciardi, III, Esquire
                                        Thomas H. Chiacchio, Jr., Esquire
                                        901 Market Street, Suite 463
                                        Wilmington, DE 19803
                                        Phone: (302) 472-9039
                                        Fax: (302) 397-2828